UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEERLESS INS. CO., et al.,

    Plaintiffs,        Case No. 17-cv-10223
                 Hon. Mark A. Goldsmith
vs.

CONIFER HOLDINGS, INC.,
et al.,

    Defendants.
_____/

# OPINION & ORDER
# DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Dkt. 13)

This matter is now before the Court on Plaintiffs Peerless Insurance Company ("Peerless") and Indiana Insurance Company's motion for summary judgment (Dkt. 13). The issues have been fully briefed, and a hearing was held on September 14, 2017. For the reasons stated below, Plaintiffs' motion is denied.

## I. BACKGROUND

Peerless issued a commercial general liability policy (the "Policy") to Defendant Conifer Holdings, Inc. ("Conifer"), covering the period from February 17, 2015 to February 17, 2016.[1] In relevant parts, the Policy provided:

  SECTION 1 – COVERAGES

---

[1] Indiana Insurance Company issued a commercial umbrella policy to Conifer for the period of February 17, 2015 to February 17, 2016. This policy applies only to amounts that exceed the Peerless Policy's $1,000,000 policy limit. As the Defendants were only obligated to pay $153,000 as a result of the jury verdict against them in the underlying lawsuit, explained supra, the Indiana Policy is no longer at issue.

1

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. [. . .]

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and [. . .]

COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. [. . .]

2. Exclusions

This insurance does not apply to:

[. . .]

i. Infringement of Copyright, Patent, Trademark or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

> However, this exclusion does not apply to infringement, in your "advertisement", or copyright, trade dress or slogan.

Commercial General Liability Coverage Form, Ex. 1 to Pls. Mot., at 1, 5-6 (Dkt. 13-2). The Policy also provided the following definitions:

> 1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. [. . .]
>
> 3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. [. . .]
>
> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> 14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a persons' or organization's goods, products or services;
>
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>
> f. The use of another's advertising idea in your "advertisement"; or
>
> g. Infringing upon another's copyright, trade dress or slogan in your "advertisement". [. . .]
>
> 17. "Property damage" means:

3

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> For the purposes of this insurance, electronic data is not tangible property.
>
> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Id. at 12-15.

On February 18, 2016, Franchise Risk Solutions, Inc. ("FRS") initiated a lawsuit[2] (the "FRS Lawsuit") against Defendants Conifer, Boris Petcoff, and Sycamore Insurance Agency d/b/a Blue Spruce Underwriters ("Blue Spruce") (collectively, "Defendants"). The FRS Lawsuit alleges that Defendants injured FRS's business when Petcoff, the former president and CEO of FRS, left FRS to work for Blue Spruce (which is owned by Conifer), and took and subsequently used FRS's proprietary information. The Fourth Amended Complaint in the FRS Lawsuit alleged causes of action for (i) actual and threatened misappropriation under the Tennessee Uniform Trade Secrets Act ("TUTSA") (against Defendants); (ii) breach of fiduciary duty (against Petcoff and against Defendants as co-conspirators); (iii) aiding and abetting breach of fiduciary duty (against Conifer); (iv) inducement of breach of contract (against Petcoff and Blue Spruce and against Defendants as co-conspirators); (v) intentional interference with employment (against Conifer); (vi)

---

[2] Franchise Risk Solutions, Inc. v. Conifer Holdings, Inc., No. 16-0176-BC, 20th Judicial District, State of Tennessee.

fraud/misrepresentation/failure to disclose (against Petcoff and against Defendants as co-conspirators); (vii) violation of the Tennessee Personal and Commercial Computer Act ("TPCCA") (against Defendants as co-conspirators); and (viii) civil conspiracy (against Defendants). See Fourth Am. Compl., Ex. 3 to Pls. Mot. (Dkt. 13-4).[3]

On April 27, 2016, Peerless sent a letter to Defendants stating that Peerless would provide Defendants a defense in the FRS Lawsuit, subject to a reservation of rights. See 4/27/2016 Letter, Ex. 5 to Pls. Mot. (Dkt. 13-6). Peerless partially paid defense costs and fees for Defendants in the FRS Lawsuit; Defendants at some point hired their own attorney, whose costs Peerless has refused to pay. See Kaplan-Rudolph Aff., Ex. H to Defs. Resp. (Dkt. 21-9).

Plaintiffs filed the instant motion on March 3, 2017. The FRS Lawsuit went to trial on March 6, 2017, and a verdict was reached on March 17, 2017. The jury found that Petcoff was liable for breach of fiduciary duty; Conifer was liable for aiding and abetting Petcoff's breach of fiduciary duty; and Blue Spruce was liable for violating the TPCCA. See Verdict Form, Ex. J to Defs. Resp. (Dkt. 21-11). The verdict included $153,000 in compensatory damages ($100,000 attributable to Petcoff; $50,000 attributable to Conifer, and $3,000 attributable to Blue Spruce), which was paid entirely by Defendants.

Plaintiffs now seek (i) a declaration that no insurance coverage is afforded under the Policy; and (ii) reimbursement of all defense fees and costs expended on behalf of the Defendants.[4]

---

[3] FRS withdrew counts four and five prior to trial. See 2/14/2017 Memorandum and Order Denying Defs. Mot. for Summ. J., Franchise Risk Solutions, Inc. v. Conifer Holdings, Inc., No. 16-0176-BC, Ex. 4 to Pls. Mot., at 2 n. 1 (Dkt. 13-5).

[4] In its motion for summary judgment, Peerless sought a declaration that it was the Defendants' burden to prove that any verdict or judgment against them is covered by the Policy. Pls. Mot. at 23. However, in its reply brief, Peerless indicated that it was no longer asking the Court to address this request. See Pls. Reply at 2 n. 2 (Dkt. 26). Therefore, the Court will only address Peerless'

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

---

requests for a "declaration that there is no insurance coverage afforded to the Conifer Defendants for the FRS Lawsuit" and "reimbursement of the defense costs incurred to defend the Conifer Defendants in the FRS Lawsuit." Pls. Reply at 2.

## III. ANALYSIS

### A. Insurance Coverage Afforded under the Policy

#### 1. Duty to Indemnify

In determining whether Peerless has a duty to indemnify Defendants, the Court "examine[s] the language of the insurance policies and interpret[s] their terms in accordance with well established Michigan principles of construction." Frankenmuth Mut. Ins. Co. v. Masters, 595 N.W.2d 832, 837 (Mich. 1999). Where the terms of the contract are clear, the Court enforces the agreement as written, but where there is ambiguity, the policy is construed in favor of the insured. Id.

Peerless puts forth several arguments explaining why various provisions of the Policy do not cover Defendants' liability in the FRS Lawsuit: (i) the FRS Lawsuit does not seek damages because of a "property damage" caused by an "occurrence"; (ii) the FRS Lawsuit does not seek damages because of "personal and advertising injury"; (iii) the Policy's trade secret exclusion precludes coverage; and (iv) Petcoff is not an insured under the Policy. See generally Pl Mot. for Summ. J. (Dkt. 13). The Court will address these in turn.

##### a. "Property damage" caused by an "occurrence"

The Policy states that Peerless "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' . . ." Commercial General Liability Coverage Form at 1. The Policy defines "property damage" as "physical injury to tangible property" or "loss of use of tangible property that is not physically injured." Id. at 15. The Policy further clarifies that "electronic data is not tangible property;" "electronic data" in turn is defined as "information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS,

7

tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment." Id. Peerless argues that the materials that Defendants were alleged to have stolen from FRS – "files [that] had been stored on Franchise Risk computers," Fourth Am. Compl. ¶ 85 – were "electronic data" and thus not "tangible property."

Defendants do not address this argument in their response. To the extent FRS alleged a "loss of use of tangible property," the Court agrees that Defendants are not entitled to coverage under the "property damage" section of the Policy, as "electronic data" is not "tangible property."

### b. "Personal and advertising injury"

The Policy provides that Peerless "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury;'" that is, as relevant here, "injury . . . arising out of . . . [t]he use of another's advertising idea in your 'advertisement.'" The Policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." The term "advertising idea" is not defined in the Policy, and the parties do not suggest how it should be interpreted. However, the Sixth Circuit, interpreting Michigan law, agreed with a Wisconsin appellate court that "advertising idea[]" was not an ambiguous term, as it had "an established dictionary meaning." Advance Watch Co., Ltd. v. Kemper Nat. Ins. Co., 99 F.3d 795, 802 (6th Cir. 1996). The Wisconsin court had found that "'advertising idea' should be understood in its ordinary meaning of 'an idea for calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage.'" Id. at 801 (quoting Atlantic Mu. Ins. Co. v. Badger Medical Supply Co., 528 N.W. 2d 486, 489-490 (Wisc. Ct. App. 1995)).

The Fourth Amended Complaint in the FRS Lawsuit alleged that Petcoff resigned as President of FRS; formed a new company, Blue Spruce; and took several of FRS's employees with him. Fourth Am. Compl. ¶¶ 8-9. One of these employees allegedly offered to bring FRS's "underwriting tools" with her; with Petcoff's approval, "she copied to her thumb drive a host of Franchise Risk's documents, brought them to Conifer, copied them onto Conifer computers, relabeled them as 'Blue Spruce' documents, and used them to establish Conifer's QSR/Casual Dining insurance program. Blue Spruce has used these relabeled Franchise Risk documents prolifically to solicit risk sharing partners and agents." Id. ¶ 10. These documents included marketing flyers, id. ¶ 11, and "underwriting guidelines," id. ¶ 86a. Following trial, the jury in the FRS Lawsuit found that Defendants were liable on three counts: Petcoff was liable for breach of fiduciary duty; Conifer was liable for aiding and abetting Petcoff's breach of fiduciary duty; and Blue Spruce was liable for violating the TPCCA.

Peerless argues that the "appetite guidelines" – a condensed version of the underwriting guidelines – are not an "advertisement" and do not contain an "advertising idea." Pls. Reply at 4 (Dkt. 26). Further, even if this Court were to conclude that the use of either the appetite guidelines or the marketing flyers constituted "us[ing] another's advertising idea in your advertisement," Peerless argues that FRS did not seek damages <u>because of</u> this "personal and advertising injury." Pls. Mot. at 14. Although the FRS Lawsuit alleges that Defendants stole and cloned its marketing flyers, this allegation is included only to show the extent to which Defendants stole FRS's information. Peerless says that FRS sought damages <u>because of</u> Defendants' appropriation of its business model.

Peerless relies on <u>National Union Fire Insurance Co. of Pittsburgh v. Alticor, Inc.</u>, Nos. 05-2479, 06-2538, 2007 WL 2733336 (6th Cir. Sept. 19, 2007), for support. In <u>Alticor</u>, the defendant-

9

insureds argued that their insurer should pay for their defense because the plaintiffs in the underlying lawsuit alleged that the defendants carried out their antitrust violations by "isolating the Plaintiffs from their downline distributors by undermining and/or disparaging the Plaintiffs and/or their principals." Id. at *3. The defendants claimed that this was a "personal injury" within the meaning of their insurance policy, because it was "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods." Id. at *2. The court disagreed, finding that the policies "clearly state that coverage is provided only for 'sums that the insured becomes legally obligated to pay as damages because of personal injury.' . . . [A]ll damages sought by [plaintiffs in the underlying action] were for various antitrust injuries, not for slander, libel, or product disparagement." Id. at *6. Similarly here, Peerless argues, the damages sought by FRS are for the misappropriation of FRS's business model, not because of the use of FRS's advertising idea in Blue Spruce's advertisement. Pls. Mot. at 17.

Defendants respond that one of the principal issues raised by FRS during trial in the FRS Lawsuit was the use of "appetite guidelines," which Defendants describe as "advertising/marketing materials given directly to agents who are the customers of FRS and Conifer." Defs. Resp. at 6 (Dkt. 21). Defendants argue that the sole allegation supporting liability on the TPCCA claim was that the advertising flyers and appetite guidelines were improperly copied by a former FRS employee and subsequently used by Petcoff when he was employed by Conifer. Defs. Resp. at 14. Additionally, the breach of fiduciary duty claim included the allegation that Petcoff approved of the copying and use of these flyers and appetite guidelines when he was employed by Conifer. Id.

The Court is unable to determine, from the information provided, whether the "appetite guidelines" are an "advertising idea" that Defendants used in its "advertisement." The parties'

own descriptions of the appetite guidelines vary greatly. Peerless maintains that they "contain no advertising or marketing information" but simply describe an insurance program, "including its available coverage offerings and its 'appetite' for the kind of businesses that it would agree to insure." Pls. Reply at 4. Defendants describe the appetite guidelines as "advertising/marketing materials distributed directly to agents (who are the customers of FRS and Conifer)." Defs. Resp. at 1. The parties attached fewer than ten pages of testimony from the trial itself,[5] although they both acknowledge that the appetite guidelines were addressed in the underlying trial. Without a complete record on what information was presented at trial regarding the nature of the appetite guidelines, the Court cannot make a determination as to whether they should be considered an "advertisement" that contained an "advertising idea."

Further, even if the Court were to determine that either the marketing flyers or the appetite guidelines contained an "advertising idea" and were an "advertisement," it is not clear whether Defendants' liability was <u>because of</u> such a "personal and advertising injury." As mentioned, this Court has very little information about what information was presented to the jury, and thus very little information about why the jury found Defendants liable. The Court has no way of knowing what facts or arguments were presented to the jury about any of the Defendants' actions, and what eventually led the jury to conclude that Petcoff, with Conifer's assistance, breached his fiduciary duty to FRS, or that Blue Spruce violated the TPCCA.

---

[5] Testimony was put forth at trial that the appetite guidelines are "something that explains to the retail agent or the wholesale agent what our appetite is, what we're looking for, franchise restaurants, the different types of franchisees that we would look for," 3/9/2017 Trial Tr., Ex. 13 to Pls. Reply, at 49 (Dkt. 26-3), and "a condensed version of the underwriting guidelines. You take the underwriting guidelines and you take from that all of the necessary information to provide an agent a guide, an appetite guide to show them what we want to do, what we don't do, how to pay us, how to deal with us, how to report a claim. It's like a quick guide to inform an agent on how to do business with us," 3/13/2017 Trial Tr., Ex. 14 to Pls. Reply, at 58 (Dkt. 26-4).

Accordingly, the Court cannot, from the information currently available, determine whether Defendants became legally obligated to pay damages because of an injury arising out of the use of FRS's advertising idea in their own advertisement.

### c. Trade Secret Exclusion

Peerless argues that to the extent FRS alleged any "personal and advertising injury," coverage is excluded because the Policy excludes coverage based on "'personal and advertising injury' arising out of the infringement of . . . trade secret or other intellectual property rights." Commercial General Liability Coverage Form at 6. However, as Defendants point out, the jury found that all three Defendants were not liable for misappropriation of trade secrets under TUTSA. See Verdict Form at 2-3 (cm/ecf page). The Court cannot, therefore, find that Defendants' liability in the FRS Lawsuit arose out of the infringement of trade secrets, and thus cannot find that the trade secrets exclusion bars coverage.

### d. Petcoff

The parties disagree as to whether Petcoff is an insured under the Policy. It is undisputed that Blue Spruce and Conifer are covered, and that the Policy covers "employees" performing "acts within the scope of their employment . . . or while performing duties related to the conduct of [the] business." Commercial General Liability Coverage Form at 9. Peerless argues that the allegations against Petcoff all concern actions he took while employed by FRS, Pls. Mot. at 19; Defendants respond that FRS's damages stem from Petcoff's use of the stolen materials, which occurred when he was employed by Conifer/Blue Spruce, Defs. Resp. at 17-18. As has been stated, the Court lacks a complete picture of why the jury found any Defendant, including Petcoff, liable, and thus refrains from concluding at this time that Peerless has no duty to indemnify Defendants for any damages assessed against Petcoff.

Because an insufficient trial record has been presented, the Court declines to rule on the duty to indemnify at this time. If and when a properly supported motion is filed, the Court will issue a definitive ruling on duty to indemnify.

### 2. Duty to Defend

Under Michigan law, "an insurer's duty to defend is broader than its duty to indemnify." Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich., 610 N.W. 2d 272, 275 (Mich. 2000) (quoting Royce v. Citizens Ins. Co., 557 N.W. 2d 144 (Mich. 1996)). "The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured." Detroit Edison Co. v. Mich. Mut. Ins. Co., 301 N.W.2d 832, 835 (Mich. 1980). "[I]f the allegations of the underlying suit arguably fall within the coverage of the policy, the insurer has a duty to defend its insured." Radenbaugh, 610 N.W.2d at 275 (quoting Royce, 557 N.W. 2d 144). "The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegation to analyze whether coverage is possible." Detroit Edison Co., 301 N.W.2d at 835.

Thus, to determine whether a duty to defend existed, the Court must examine the pleadings in the FRS Lawsuit. The parties have provided the First Amended Complaint (which was filed one day after the original complaint, see Case Summary, Ex. 8 to Pls. Mot. (Dkt. 13-9)), as well as the Fourth Amended Complaint, which was the final complaint filed. See Fourth Am. Compl.; Am. Compl., Ex. 12 to Pls. Mot. (Dkt. 26-2).

The Amended Complaint alleges that a former FRS employee "logged onto Franchise Risk's secure served and downloaded a massive cache of its most sensitive data to his personal Dropbox folder," including "Franchise Risk's underwriting guidelines[.]" Am. Compl. ¶ 8. It further alleges that Blue Spruce "has in hand Franchise Risk's stolen data, and it is cloning

13

Franchise Risk's program, right down to its marketing flyers." Id. ¶ 13. The Amended Complaint contains causes of action for violation of the TUTSA; breach of fiduciary duty; aiding and abetting the breach of fiduciary duty; inducement of breach of contract; intentional interference with employment; fraud/misrepresentation/failure to disclose; violations of the TPCCA; and civil conspiracy. See id.

Peerless has not shown that there is no arguable basis for finding that the allegations of the FRS Lawsuit fall within the coverage of the policy. It is certainly arguable that at least one of the claims was for damages because of injury arising out of the use of FRS's advertising idea in Blue Spruce's advertisement. And an insurer has a duty to defend "if there are any theories of recovery that fall within the policy," even if there are "theories of liability asserted against any insured which are not covered under the policy." Radenbaugh, 610 N.W. 2d at 275 (quoting Royce, 557 N.W. 2d 144). The Court cannot find that Peerless did not owe Defendants a duty to defend.

Summary judgment on Peerless' request for a declaration that it had no duty to defend is, therefore, denied.[6]

### B. Reimbursement of Defense Costs

Peerless argues that it is entitled to reimbursement of the costs that it incurred defending Defendants in the FRS Lawsuit. Peerless argues that this is so even if it had a duty to defend, because it is entitled to reimbursement of the fees and costs it expended to defend the non-covered causes of action. Peerless relies on Travelers Prop. Cas. Co. v. R.L. Polk & Co., No. 06-12895,

---

[6] Because coverage is arguable, the Court could grant summary judgment on the duty to defend in favor of Defendants. See Radenbaugh, 610 N.W. 2d at 275. But Defendants did not move for summary judgment on that issue, and there may be arguments Peerless would have made, had Defendants moved for summary judgment as to the duty to defend. For those reasons, the Court will not presently grant summary judgment on the duty to defend to Defendants.

2008 WL 786678, at *2 (E.D. Mich. Mar. 24, 2008), where the court found that the insurer could recoup defense costs for those claims which "clearly and unequivocally" do not give rise to a duty to defend, even though they could not recoup defense costs "for all claims which even arguably fall under Defendant's insurance policy . . . even if it is later determined the duty to defend did not exist."

Defendants, in turn, argue that the Michigan Supreme Court's decision in <u>Hastings Mut. Ins. Co. v. Mosher Dolan Cataldo & Kelly, Inc.</u>, 856 N.W. 2d 550 (Mich. 2014), means that where a duty to defend exists as to any claim, the insurer is not entitled to any reimbursement. In <u>Hastings</u>, the Court reversed the Court of Appeals' finding that the insurer had a right to restitution of the payment of defense costs, because "[a]n insurer has a duty to defend, despite theories of liability asserted against the insured that are not covered under the policy, if there are any theories of recovery that fall within the policy . . . because [insurer] had a duty to defend, it is not entitled to restitution." <u>Id.</u> at 550.

Defendants have since raised this issue in their partial motion for summary judgment (Dkt. 36). Given the incompleteness of the record, and the additional briefing on this issue that will be forthcoming following the February 5 status conference, the Court declines to address summary judgment on this claim at this time.

### IV. CONCLUSION

For the reasons above, Plaintiffs Peerless Insurance Company and Indiana Insurance Company's motion for summary judgment (Dkt. 13) is denied.

SO ORDERED.

Dated: January 24, 2018       s/Mark A. Goldsmith  
Detroit, Michigan       MARK A. GOLDSMITH  
     United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 24, 2018.

                                                      s/Karri Sandusky
                                                      Case Manager